T.C. Memo. 2005-236

UNITED STATES TAX COURT

NHUSS TRUST, ET AL.,[1] Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 9938-04, 9939-04,     Filed October 11, 2005.
            10070-04, 10071-04.

<u>Anthony V. Diosdi</u>, for petitioners.

<u>John W. Strate</u> and <u>Thomas D. Greenaway</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

SWIFT, <u>Judge</u>:  Respondent determined deficiencies and
penalties in petitioners' Federal income tax as follows:

_____

[1]  Cases of the following petitioners are consolidated
herewith:  In God and Trust, a.k.a. In God We Trust, docket No.
9939-04; RJ Pendergraft Trust, Joyce Pendergraft, Trustee, docket
No. 10070-04; Riley and Joyce Pendergraft, docket No. 10071-04.

NHUSS Trust:

| Year | Deficiency | Penalty |
|------|-----------|---------|
| 1999 | $358,038 | $71,608 |
| 2000 | 329,456 | 65,891 |

In God and Trust, a.k.a. In God We Trust (In God We Trust):

| Year | Deficiency | Penalty |
|------|-----------|---------|
| 1999 | $58,072 | $11,614 |
| 2000 | 66,074 | 13,215 |

RJ Pendergraft Trust, Joyce Pendergraft, Trustee:

| Year | Deficiency | Penalty |
|------|-----------|---------|
| 1999 | $ 95,958 | $19,192 |
| 2000 | 438,772 | 87,754 |

Riley and Joyce Pendergraft:

| Year | Deficiency | Penalty |
|------|-----------|---------|
| 1999 | $416,081 | $83,216 |
| 2000 | 445,987 | 89,197 |

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. All references to petitioners are to petitioners Riley and Joyce Pendergraft, and all references to petitioner in the singular are to Riley Pendergraft.

After concessions by all parties (particularly a concession collapsing the income and expenses of the above three trusts for each year into petitioners' income and expenses) and settlements entered into by all parties (particularly settlements relating to various business and personal deductions), the only remaining issues for decision are: (1) The amount of petitioners' gain on the sale of their residence; (2) the fair market value of a van on the date the van was donated to charity; and (3) petitioners' liability for the negligence penalty under section 6662(a) in the

total amounts of $83,216 and $89,197 for 1999 and 2000, respectively, with respect to the tax adjustments relating to the three trusts, the gain on the sale of petitioners' residence, and the donation of the van.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

At the time the petition was filed, petitioners resided in Gilroy, California.

Petitioners' Residence

In 1972, petitioners purchased for $45,000 a residence located in San Jose, California.  In 2000, petitioners sold the residence for $790,000.

Set forth in the schedule below is a list of various categories of improvements that petitioners claim they made on their residence prior to its sale in 2000, the total improvement costs petitioners claim they incurred in each category, and the improvement costs relating to each category that respondent has allowed.

| | Costs | |
| | Petitioners | Respondent |
| Category of Improvement | Claim | Has Allowed |
| Residence | $ 28,000 | $28,000 |
| Swimming pool | 38,515 | 6,245 |
| Second story addition | 60,000 | 16,665 |
| Interior remodeling | 114,500 | 1,022 |
| Exterior | 43,191 | 3,527 |
| Alarm | 1,864 | 825 |
| Total | $286,070 | $56,284 |

The above improvement costs claimed by petitioners are reflected either in various building permits obtained by petitioners (Appendix A), in other contemporaneous records maintained by petitioners (Appendix B), or in petitioners' testimony at trial (Appendix C).[2] The $56,284 in improvement costs that respondent has allowed are based on the costs that are reflected in the building permits (Appendix A) and on some but not all of the costs reflected in the contemporaneous records (Appendix B). Also, a few additional costs that respondent has allowed are reflected in Appendix D. Respondent has disallowed all of the costs reflected in Appendix C.

Further, in connection with the sale of their residence, petitioners incurred closing costs of $61,864.

In summary, petitioners and respondent calculate petitioners' cost basis in the residence as follows:

|  | Calculation of Cost Basis in Residence | |
|  | Petitioners | Respondent |
| --- | --- | --- |
| Purchase price | $ 45,000 | $ 45,000 |
| Improvements | 286,070 | 56,284 |
| Closing costs | 61,864 | 61,864 |
| Total | $392,934 | $162,968 |

---

[2] For purposes of the above schedule, where the various sources of evidence in the case reflect different amounts for the same improvement, the schedule reflects the higher amounts.

Donation of Van

In October of 1996, petitioners purchased a 1996 Ford E150 conversion van. On October 30, 2000, petitioners donated the van to the Cancer Fund. At the time of the donation, the van had been used in petitioners' furniture business and had approximately 220,000 miles on it,[3] and the van had, among other things, a cracked windshield and a broken fender.

At the time of the donation, the Kelley Bluebook indicated generally a wholesale value of $14,750 and a retail value of $20,425 for a van of the same year, make, and model.

On November 10, 2000, Mr. Monte Sobrero appraised the van at $19,750.

The record does not reflect who hired Mr. Sobrero, how much Mr. Sobrero was paid, or who paid Mr. Sobrero for his appraisal. The record is also unclear as to whether the van was still in petitioners' possession at the time of its appraisal by Mr. Sobrero.

Mr. Sobrero's stated appraisal qualifications include 40 years as a craftsman in metal finishing and paint restoration, 30 years as a licensed automotive dealer in California, 15 years as owner-operator of an automotive shop, 10 years as owner-manager

---

[3] Petitioner testified that the van was driven between 55,000 and 60,000 miles a year in petitioners' furniture business. On their 2000 joint Federal income tax return, petitioners indicated that in 2000 petitioners drove the van 72,000 miles.

of an automotive leasing and rental business, and certification in the International Automotive Appraisers Association.

Mr. Sobrero's appraisal of petitioners' van consisted of a visual inspection.  Mr. Sobrero, however, did not take into account in his appraisal the mileage of the van.

On December 16, 2000, 6 weeks after receiving the donated van from petitioners, the van was sold at auction by the Vehicle Donation Processing Center, Inc., for $6,900.

Negligence Penalty and Petitioners' Three Trusts

During 1999 and 2000, petitioners were engaged in the wholesale furniture business in Nevada and northern California. For more than a decade before 1997, petitioners operated their furniture business as a corporation called NHUSS, Inc.  In 1997, petitioners dissolved NHUSS, Inc., and began operating their furniture business through a trust called the NHUSS Trust.

In a brochure distributed by National Trust Service (NTS), founded and promoted by one Roy Fritz, NTS claimed that taxpayers could "with [their] custom designed NTS Trust Document * * * regain [their] inalienable rights and freedoms" by attending an NTS workshop where they would learn to create their own trusts that purportedly would protect taxpayers' assets while lowering or eliminating their tax liabilities.  Petitioners paid approximately $10,500 to attend the NTS workshop.  Mr. Fritz claimed to be a lawyer and "world authority on complex trusts."

Petitioner did not seek a second opinion regarding the legitimacy of NTS or its trust services. Petitioner did not investigate Mr. Fritz's background or attempt to confirm Mr. Fritz's qualifications. Petitioner did not consult his personal accountant about NTS's proposal that he establish trusts as a means to protect assets and reduce tax liabilities. Petitioners did not research NTS.

Instead, in addition to Mr. Fritz, petitioners relied on information provided to them by representatives of NTS and by other purported clients of NTS. Other than NTS's promotional materials, petitioners did not receive any written advice, such as a written opinion from an attorney, regarding the promotional materials received from NTS.

On August 21, 1997, pursuant to information received by petitioners at the NTS seminar, petitioners formed RJ Pendergraft Trust using a trust indenture notarized by an NTS employee. Petitioner was the grantor, and petitioners were named trustees of RJ Pendergraft Trust.

On August 22, 1997, two additional trusts, NHUSS Trust and In God We Trust, were formed using declarations of trust notarized by an NTS employee, which declarations were prepared by NTS. NHUSS, Inc., was grantor, and petitioners were named trustees of NHUSS Trust. NHUSS Trust was grantor, and petitioners were named trustees of In God We Trust.

Upon the formation of NHUSS Trust, NHUSS, Inc., purportedly contributed all of its assets relating to petitioners' furniture business to NHUSS Trust. It is unclear what, if any, assets were purportedly contributed to RJ Pendergraft Trust and to In God We Trust.

On May 31, 2002, petitioners reported to respondent their status as trustees of the above three trusts on separate Forms 56, Notice Concerning Fiduciary Relationship.

For 1999 and 2000, petitioners' joint individual Federal income tax returns and the three trusts' Federal income tax returns were prepared by Sam Fung (a.k.a. Fong), purportedly a certified public accountant.

In connection with the preparation of their joint Federal income tax returns, petitioners provided to Mr. Fung check registers relating to petitioners' furniture business along with a summary of the various related expenses (e.g., cost of goods sold and transportation).

Petitioners reported on their joint Federal income tax returns for 1999 and 2000 nominal wages as taxable income, which, after petitioners' personal exemptions, was reduced to zero taxable income and resulted in no tax liability being reported on petitioners' joint individual Federal income tax returns for 1999 and 2000.

On trust Federal income tax returns for 1999 and 2000, filed with respondent on behalf of NHUSS Trust, the income of the

furniture business was reported, and improper deductions were claimed for purported distributions to the other two trusts (RJ Pendergraft Trust and In God We Trust) and for alleged business expenses relating to petitioners' furniture business, all of which offset NHUSS Trust's reported income, and resulted in no tax liability being reported on NHUSS Trust's tax returns.

On the 1999 and 2000 trust Federal income tax returns of RJ Pendergraft Trust and In God We Trust, various improper deductions were claimed for business and personal expenses that offset the trusts' reported income and that resulted in no tax liability being reported.

The following schedules summarize the gross income, taxable income (loss), and tax liability reported on the above joint individual and trust Federal income tax returns for 1999 and 2000:

1999

| Date Filed | Type of Return | Taxpayer | Gross Income | Reported Taxable Income (Loss) | Tax Liability |
|---|---|---|---|---|---|
| 04/10/00 | Trust | NHUSS Trust | $886,784 | ($69) | -0- |
| 04/10/00 | Trust | In God We Trust | 149,180 | (62) | -0- |
| 04/10/00 | Trust | RJ Pendergraft Trust | 244,850 | (72) | -0- |
| 04/09/00 | Joint | Petitioners | 4,800 | -0- | -0- |

2000

| Date Filed | Type of Return | Taxpayer | Gross Income | Reported Taxable Income (Loss) | Tax Liability |
|---|---|---|---|---|---|
| 04/10/01 | Trust | NHUSS Trust | $805,884 | ($73) | -0- |
| 04/10/01 | Trust | In God We Trust | 169,425 | (55) | -0- |
| 04/10/01 | Trust | RJ Pendergraft Trust | 696,857 | (60) | -0- |
| 04/09/01 | Joint | Petitioners | 4,800 | -0- | -0- |

On July 23, 2002, respondent's revenue agent mailed a letter to petitioner Joyce Pendergraft with respect to an examination of petitioners' 1999 and 2000 joint individual Federal income tax returns, which letter included a request for certain books, records, and documents relating to petitioners' three trusts and the sale of petitioners' residence.

On October 21, 2002, petitioners entered into a closing agreement with respondent in which agreement petitioners agreed, in principle, that for 1999 and 2000 the NHUSS Trust, the In God We Trust, and the RJ Pendergraft Trust would be disregarded for Federal income tax purposes, that the reported income and expenses of the three trusts would be collapsed into petitioners' income and expenses, and that petitioners were liable for the tax deficiencies for 1999 and 2000 that related to the trusts' income and expenses being charged to petitioners. In the above-referenced October 21, 2002, closing agreement, the parties did not finalize or specify the specific amounts of the income and expenses of the trusts that would be charged to petitioners, nor did the parties specify the amounts of the deficiencies that would be charged to petitioners.[4]

---

[4] We note that, in the closing agreement petitioners entered into with respondent, petitioners appear to have agreed that they would be liable for penalties relating to the collapse of the income and expenses of the three trusts into petitioners' income and expenses. However, in the trial stipulation, the parties stipulate that petitioners' liability for these penalties is still in issue, and the parties have briefed this issue. We

(continued...)

In November of 2002, a second request was made by respondent for petitioners' books and records.

During respondent's audit examination, petitioners did not provide to respondent the requested books and records.

On April 2, 2004, respondent mailed to petitioners separate notices of deficiency for 1999 and 2000 with respect to NHUSS Trust, RJ Pendergraft Trust, and In God We Trust. In the notices of deficiency, respondent determined, among other things, that in 1999 and 2000 various claimed deductions (e.g., deductions relating to purported distributions made between the trusts and business expense deductions relating to the furniture business) were not properly substantiated, that in 1999 and 2000 rental income was not reported, and that in 1999 and 2000 various charitable deductions (including the charitable deduction for the donation of the van) claimed by RJ Pendergraft Trust were not properly substantiated.

Also on April 2, 2004, respondent mailed to petitioners a notice of deficiency for 1999 and 2000 relating to petitioners' joint individual Federal income tax liabilities. Respondent determined, among other things, that for 1999 and 2000 the trusts' income and expenses were to be collapsed into petitioners' income and expenses and that for 2000 petitioners

---

[4](...continued)
treat petitioners' liability for the negligence penalty with respect to the tax adjustments relating to the three trusts as still in issue.

realized $230,460 in taxable capital gain on the sale of their residence.[5]

During the trial of these consolidated cases involving both petitioners and the trusts, the parties stipulated the specific amounts that were to be collapsed from the trusts' reported income and expenses into petitioners' income and expenses as follows:

1999
 Trust Income and Expenses to Be

| Charged to Petitioners | Amount |
| --- | --- |
| NHUSS Trust income | $881,779 |
| In God We Trust income adjustment | (149,180) |
| Rental income | 19,200 |
| Cost of goods sold | (230,005) |
| Commission expense | (20,189) |
| Car and truck expense | (10,000) |
| Meals and entertainment expense | (4,082) |
| Travel expense | (837) |
| Home office expense | (417) |

---

[5]  In the notice of deficiency respondent's calculation of petitioners' gain on the sale of their residence was based on a cost of $45,000 and, due to the failure of petitioners to provide their books and records, improvements of only $14,540 for a total cost basis of $59,540.  The sale price of $790,000, less the $59,540 cost basis, less the $500,000 exemption, equals the $230,460 in capital gain computed by respondent in the notice of deficiency.  Once petitioners, prior to the scheduled trial, herein, provided their books and records to respondent, respondent agreed to an increase in petitioners' cost basis in the residence from $59,540 to $162,968.

2000
 Trust Income and Expenses to Be
     Charged to Petitioners

| Trust Income and Expenses to Be Charged to Petitioners | Amount |
|---|---|
| NHUSS Trust income | $786,223 |
| In God We Trust income adjustment | (169,425) |
| Ordinary recapture income | 29,770 |
| Rental income | 19,200 |
| Cost of goods sold | (265,153) |
| Gross income adjustment | (70,000) |
| Commission expense | (27,334) |
| Car and trust expense | (18,374)* |
| Home office expense | (7,866) |
| Meals and entertainment expense | (2,766) |
| Travel expense | (1,035) |
| Charitable deduction | (336) |

     * At trial, respondent stated that the parties agreed
that petitioners' car and truck expenses in 2000 were
$15,691.  The parties, however, stipulated in writing that
the car and truck expenses were $18,374, and we use the
stipulated amount.


The parties' stipulation does not separately identify any
income and expenses of RJ Pendergraft Trust that are to be
charged to petitioners.  We understand, however, that the income
and expenses of RJ Pendergraft Trust were appropriately collapsed
into petitioners' income and expenses and are reflected in the
above figures.


                              OPINION

Burden of Proof

     Generally, under section 7491(a), the burden of proof
relating to factual issues relevant to an individual's tax
liability may shift from the taxpayer to respondent where the
taxpayer:  (1) Has credible evidence to substantiate the item in
question; (2) has maintained appropriate records relating

thereto; and (3) has cooperated with reasonable requests by respondent for information relating to the item in question. Sec. 7491(a)(1) and (2); Rule 142(a).

Petitioners' failure to cooperate with respondent during the audit of the tax years at issue precludes a shift in the burden of proof from petitioners to respondent with respect to the factual issues before us. Sec. 7491(a)(2)(B). Further, during respondent's audit, petitioners failed to provide books and records relating to the cost basis in their residence, and petitioners failed to produce credible evidence with regard to the value of the van. See infra. Generally, for purposes of section 7491(a)(2)(B), later cooperation by taxpayers will not act to cure prior noncooperation at examination or Appeals. H. Conf. Rept. 105-599, at 239 (1998), 1998-3 C.B. 747, 993-994.

The burden of proof with respect to the amount of gain petitioners realized on the sale of their residence and the amount of petitioners' charitable deduction relating to the van is not shifted to respondent and remains on petitioners.

## Gain on Sale of Petitioners' Residence

For 2000, under sections 61 and 1001, gain on the sale or disposition of a personal residence is included in gross income, subject to an exclusion, for married taxpayers filing joint tax returns, of up to $500,000. Sec. 121(a) and (b)(2).

The basis of property is determined by its cost. Sec. 1012; Gandy v. Commissioner, T.C. Memo. 1997-532, affd. 199 F.3d 440 (5th Cir. 1999).

Respondent contends that petitioners have failed to substantiate a cost basis in their residence above the $163,148 determined by respondent at trial and that petitioners therefore in 2000 realized $126,852 in capital gain on the sale.[6]

With one exception noted below, we regard all of the costs petitioners claim in excess of the $163,148 allowed by respondent as not sufficiently substantiated. We do allow petitioners an increase of $24,945 in their cost basis to reflect additional swimming pool improvement costs that are reflected in petitioners' contemporaneous records (Appendix B). Respondent himself has allowed all of the other costs reflected in Appendix B, and evidence relating to the swimming pool is as credible as the evidence relating to the other items allowed by respondent. We believe petitioners' contemporaneous records (Appendix B) substantiate a $24,945 increase in the cost basis of the swimming pool to a total swimming pool cost of $31,190.

The following schedule reflects our findings with regard to petitioners' cost basis in the residence at the time of its sale in 2000:

---

[6] The sale price of $790,000, less the $163,148 cost basis respondent allows, less the $500,000 exemption, equals $126,852 in capital gain.

| Residence Cost Basis | Amount |
|---|---|
| Purchase price | $ 45,000 |
| Improvements | |
|   Residence | 28,000 |
|   Swimming pool | 31,190 |
|   Second story addition | 16,665 |
|   Interior remodeling | 1,022 |
|   Exterior | 3,527 |
|   Alarm | 825 |
| Closing costs | 61,864 |
| Total | $188,903 |

We calculate petitioners' taxable gain on the sale of the residence in 2000 to be $101,907 ($790,000 sale price, less $188,903 cost basis, less $500,000 exemption, equals $101,907 capital gain).

Charitable Deduction for Value of Van

Generally, under section 170(a)(1), a deduction is allowed for charitable contributions made within the year. See sec. 1.170A-1, Income Tax Regs. The regulations state that the amount to be allowed for a charitable contribution of property other than money is to be the "fair market value of the property at the time of the contribution". Sec. 1.170A-1(c)(1), Income Tax Regs.

Generally, the best evidence of fair market value is an actual sale of the property in an arm's-length transaction within a reasonable time before or after the valuation date. Berry

<u>Petroleum Co. v. Commissioner</u>, 104 T.C. 584, 637 (1995), affd.
142 F.3d 442 (9th Cir. 1998).[7]

Six weeks after petitioners donated the van, petitioners'
van was sold for an amount almost $13,000 less than Mr. Sobrero's
appraisal. In his appraisal, Mr. Sobrero failed to account for
the mileage of the van, which mileage, based on petitioner's
testimony, would have been approximately 220,000 miles.

On the evidence before us, we conclude that the fair market
value of petitioners' van on the date of its donation, for
purposes of the claimed charitable contribution deduction, was
its $6,900 sale price in December of 2000.

## Section 6662(a) Negligence Penalty

Under section 6662(a), a penalty is imposed on "any portion
of an underpayment of tax required to be shown on a return" that
is attributable to negligence or to disregard of the rules or
regulations. Sec. 6662(b)(1). Respondent has asserted the
negligence penalty against petitioners with respect to the
adjustments collapsing the reported income and expenses of the
three trusts into petitioners' income and expenses, the gain on
the sale of petitioners' residence, and the donation of the van.

---

[7] We note that the American Jobs Creation Act of 2004, Pub.
L. 108-357, sec. 884, 118 Stat. 1632, effective for years
beginning after 2004, added a provision in sec. 170 generally
limiting a taxpayer's charitable deduction relating to a donation
of a vehicle to the actual sales price of the vehicle when sold
by the donee organization. Sec. 170(f)(12)(A)(ii).

For purposes of section 6662, negligence "includes any failure to make a reasonable attempt to comply with the provisions of this title," and disregard "includes any careless, reckless, or intentional disregard." Sec. 6662(c); Drum v. Commissioner, T.C. Memo. 1994-433, affd. without published opinion 61 F.3d 910 (9th Cir. 1995).

Under section 7491(c), respondent bears the burden of production with respect to the section 6662(a) penalty. See also Rule 142(a). If, however, respondent satisfies his burden of production, the taxpayer continues to have the burden of proof with respect to imposition of this penalty. Rule 142(a); Higbee v. Commissioner, 116 T.C. 438 (2001).

Respondent has satisfied his burden of production under section 7491(c) because petitioners have conceded that they are liable for increased tax liabilities relating to the collapse of the trusts and because we have found that petitioners understated the amount of gain they realized on the sale of their residence and overstated the amount of their charitable deduction with respect to the van.

Petitioners unreasonably relied on NTS and Mr. Fritz in establishing the three trusts, on unsubstantiated costs with regard to the gain on the sale of the residence, and on an appraisal that was not credible with regard to the value of the van.

Under the circumstances, we find that petitioners' underpayments of Federal income taxes for 1999 and 2000 were due to negligence and that petitioners are liable for the section 6662(a) negligence penalty for 1999 and 2000 with respect to the adjustments relating to the three trusts, to the gain on the sale of petitioners' residence, and to the donation of the van.

We have considered all arguments made herein, and, to the extent not addressed, we conclude that they are without merit or are irrelevant.

To reflect the foregoing,

<u>Decisions will be entered under Rule 155</u>.

## Appendix A

Improvements and costs reflected on building permits obtained by petitioners:

| Category of Improvement | Date | Permit No. | Description | Cost |
|---|---|---|---|---|
| Residence | 09/12/72 | 74338 | Improvements | $28,000 |
| Swimming pool | 05/07/73 | 76866 | Swimming pool | 3,500 |
| Second story addition | 11/14/78 | 14021 | Second story | 16,665 |
| Interior remodeling | 05/01/00 | P0057485 | Plumbing | Unknown |
| | | | Total | $48,165 |

## Appendix B

Improvements and costs reflected in contemporaneous records maintained by petitioners relating to improvements made to the residence:

| Category of Improvement | Cost | |
|---|---|---|
| Swimming pool | | |
| Pool | $15,370.00 | |
| Cement | 14,200.00 | |
| Wrought iron fence | 1,620.10 | |
| | | $31,190.10 |
| Interior remodeling | | |
| Plumbing | $ 136.81 | |
| Wallpaper and paint | 133.86 | |
| Curtains and curtain rods | 301.16 | |
| Garage storage | 241.82 | |
| Miscellaneous improvements | 136.26 | |
| | | 949.91 |
| Exterior | | |
| Landscaping | $ 2,791.48 | |
| Cabana, shed, and lighting | 435.21 | |
| Outside fence | 47.45 | |
| | | 3,274.14 |
| Total | | $35,414.15 |

Appendix C

Improvements and costs testified to at trial without supporting documentation:

| Category of Improvement | Cost | |
|---|---|---|
| Installed alarm system | $ 1,864 | |
| | | $ 1,864 |
| | | |
| Swimming pool | | |
| Swimming pool and spa | $ 15,370 | |
| Cement deck | 14,200 | |
| Wrought iron fence | 1,200 | |
| Replaced wrought iron fence | 2,000 | |
| Solar panels | 2,745 | |
| Replaced solar panels | 3,000 | |
| | | 38,515 |
| | | |
| Second story addition | | |
| Added second story, stairs, plumbing | $ 60,000 | |
| | | 60,000 |
| | | |
| Interior remodeling | | |
| Re-carpeted (three times) | $ 15,000 | |
| Master bedroom, bathrooms, kitchen remodel | 87,000 | |
| Plumbing repairs | 2,000 | |
| Soft water system | 750 | |
| Re-tiled master bathroom shower | 5,000 | |
| Replaced water heater (two times), etc. | 2,000 | |
| Chair molding, hallways | 750 | |
| Crown molding, living and dining rooms | 2,000 | |
| | | 114,500 |
| | | |
| Exterior | | |
| Plants, flower beds | $ 6,000 | |
| Replaced gutters | 1,200 | |
| Storage shed, roof | 3,900 | |
| Second storage shed | 800 | |
| Replaced sidewalk | 1,000 | |
| Replaced garage door | 700 | |
| Backyard electrical lighting | 300 | |
| Added door from garage to yard | 500 | |
| Side yard electrical | 500 | |
| Garage exterior lighting | 450 | |
| Replaced roof | 22,500 | |
| Shutters | 3,341 | |
| Replaced redwood fence (two times) | 2,000 | |
| | | 43,191 |
| Total | | $258,070 |

## Appendix D

Additional improvements and costs agreed to by respondent:

| Category of Improvement | Cost | |
|---|---|---|
| Alarm | $   825 | |
| | | $   825 |
| | | |
| Swimming pool | | |
|   Solar | $2,745 | |
| | | 2,745 |
| | | |
| Interior remodeling | | |
|   Garage cupboards | $   154 | |
|   Dining | 255 | |
|   Molding shutters | 613 | |
| | | 1,022 |
| | | |
| Exterior | | |
|   Shutters | $3,361 | |
|   Trees | 166 | |
|     Exterior total | | 3,527 |
|           Total | | $8,119 |